STOWE (BARKER v.). See Cases Nos. 994 and 995.

## Case No. 13,514.
### STOWE v. THOMAS.
[2 Wall. Jr. 547; 2 Am. Law Reg. 210; 1 Pittsb. Rep. 82; 1 Pittsb. Leg. J. 129; 11 . Leg. Int. 2; 2 Liv. Law Mag. 417.] [1]

Circuit Court, E. D. Pennsylvania. Oct. Term, 1853.

COPYRIGHT — COPYRIGHT TRANSLATION — SUBSEQUENT TRANSLATION.

A prose translation (having no qualities of a paraphrase) of a copyright prose romance,

[1] [Reported by John William Wallace, Esq. 1 Pittsb. Leg. J. 129, contains but a partial report.]

which the author had herself caused to be translated in a way she liked, and copyrighted, is not an infringement of the author's copyright of the original.
[Cited in Keene v. Wheatley, Case No. 7,644; Greene v. Bishop, Id. 5,763; Lawrence v. Dana, Id. 8,136; The "Mark Twain" Case, 14 Fed. 730. Cited, contra, in Henry Bill Pub. Co. v. Smythe, 27 Fed. 921.]

The act of congress (Act Feb. 3, 1831 [4 Stat. 436]) respecting copy-rights gives to the "author of any book" the "sole right and liberty of printing, reprinting, publishing and vending such book:" and if any other person shall print, publish or import, &c., "any copy of such book" without the consent, &c., affixes certain penalties for the infringement of copy-right. With this act in force, Mrs. Harriet Beecher Stowe published in 1850–52, a romance called "Uncle Tom's Cabin: or Life among the Lowly." The copy-right had been duly secured. The book became very popular, and soon after its publication Mrs. Stowe "employed at much expense Hugo Rudolph Hutton, a competent German scholar of ability and critical knowledge of the German language, as also of the English, to translate and copy it into the German language." Dr. Hutton was assisted in his labours by Mrs. Stowe's husband: and by these individuals, at her expense, her said book, as she alleged, had "been fully, completely, accurately and skilfully translated and copied, printed and published in the German language;" and in that form duly secured by copy-right. With this original and translation before the public, the defendant made a second translation into German. It appeared in chapters, in the columns of a daily newspaper, Die Freie Presse; the type before distribution being used to print a re-publication in pamphlet form. The ordinary formalities to secure copy-right had been taken in regard to this translation. The Die Freie Presse was printed at Philadelphia and circulated extensively among the German population with which that place and adjoining parts of Pennsylvania are known to abound. There being no considerable dispute about facts, the question on this bill for injunction was, whether the translation was an infringement of Mrs. Stowe's copyright in the original.

S. H. and S. C. Perkins, for Mrs. Stowe.

The question is novel. There are no decisions on the point either in England or in the United States, and but recently in France. Prussia, in her general Code of 1791, §§ 1027, 1028 (1 Renouard, 267), and the general law of 1837, § 4 (1 Renouard, 268); Russia, in the Digest of 1835, tit. 2 (1 Renouard, 283); and Belgium, by the laws of 1814, art. 12 (1 Renouard, 248); and 1817, art. 2 (1 Renouard, 249), have all deemed the subject of importance enough to make it one of express provision. We have no express legislation, but the subject has been discussed abstractly by text-writers. The question is more important in America than elsewhere, owing to the originally mixed character of our people, and to the

constant emigration of foreigners to our country, most of whom become our citizens long before they can read our language. This influx from the continent of Europe is greatly increasing. It will go far to change the nature of our population. There is no doubt that the question is of deeper importance in this country than it ever has been in this or in any other country, at any time before.

An author is the "creator," the "efficient cause" of a thing. Webst. Dict. In respect to a book, he is the creator of the ideas—the thought—the plan—the arrangement—the figures—the illustrations—the argument—the style of expression. The exclusive right to sell these is what is secured by copyright. The right is original, inherent; a right founded on nature, acknowledged, we think, at common law; a right which stands on better ground and is more deeply rooted than the right to any other property whatever. See Marlin's argument, 3 Repertoire de Jur. 701, tit. "Contrefaçon," § 11.[1] Now a translation is an infringement of this right. The translator aims to convey to the mind of his reader the ideas and thoughts of the author; nay, the very shades of his ideas and thoughts; his exact manner and form of expression, and even his words, so far as represented by similarly constructed expressions in the new language. All changes, all variations in any of these particulars, are failures, and are studiously guarded against. Particular language—words of one tongue as distinguished from words of another—are but the signs of his ideas. A perfect translation will present the identical creation and mental production, in a way that the sign is never thought of.

A mere or bare translation, which this is, even though spirited, if it be so, calls for no creation on the part of the translator. Any one who understands two languages can translate from one to the other. The translation is the same book. We have nothing to do in this case with the question of paraphrase, or rendering from prose to ·poetry, or vice versa. Those matters may present difficulties. Our case is simple and does not touch them. This is a mere translation, and is no more a new book because every American cannot understand it, while every German can, than a book printed in common characters from a copy in raised characters (such as is used by the blind) is a new or different book, because a blind man cannot read this first, while one who has the use of his eyes can.

Admitting, as is true, that great genius of a particular kind is required to make a perfect translation, so much the worse. It is great genius applied to present everything which is the author's in a form which is his in everything but his right to profit by it. It is great genius applied to great wrong; and the greater the genius, and the more perfect his work, the greater the wrong. There is not so much genius required to translate

[1] "It is provided in the constitution of the United States," says Mr. Webster, "that congress shall have power to promote the progress of science and the useful arts by securing for a limited time, to authors and inventors, the exclusive right to their respective writings and discoveries. The law acknowledges the existence of the right of an inventor to his invention as property, and the constitution is remarkably exact in the language in which it speaks of this important subject. The constitution does not attempt to give an inventor a right to his invention, or to an author a right to his literary productions. No such thing. But the constitution recognizes an original, pre-existing, inherent right of property in the invention, and authorizes congress to secure to inventors the enjoyment of that right. But the right existed before the constitution and above the constitution, and is, as a natural right, more clear than that which a man can assert in almost any other kind of property. What a man earns by thought, study, and care, is as much his own, as what he obtains by his hands. It is said that, by the natural law, the son has no right to inherit the estate of his father—or to take it by devise. But the natural law gives man a right to his own acquisitions, as in the case of securing a quadruped, a bird, or a fish by his skill, industry, or perseverance. Invention, as a right of property, stands higher than inheritance or devise, because it is personal earning. It is more like acquisitions by the original right of nature. In all these ·there is an effort of mind as well as muscular strength. Upon acknowledged principles, rights acquired by invention stand on plainer principles of natural law than most other rights of property. Blackstone, and every other able writer on public law, thus regards this natural right and asserts man's title to his own invention or earnings. The right of an inventor to his invention is no monopoly. It is no monopoly in any other sense than as a man's own house is a monopoly. A monopoly, as it was understood in the ancient law, was a grant of the right to buy, sell, or carry on some particular trade, conferred on one of the king's subjects, to the exclusion of all the rest. Such a monopoly is unjust. But a man's right to his own invention is a very different matter. It is no more a monopoly for him to possess that, than to possess his own homestead. But there · is one remarkable difference in the two cases, which is this, that property in a·man's own invention presents the only case where he is made to pay for the exclusive enjoyment of his own. For by law the permission so to enjoy the invention for a certain number of years is granted, on the condition that, at the expiration of the patent, the invention shall belong to the public. Not so with houses; not so with lands; nothing is paid for them, except the usual amount of taxation; but for the right to use his own, which the natural law gives him, the inventor, as we have just seen, pays an enormous price. Yet there is a clamor out of doors, calculated to debauch the public mind. But a better feeling begins to prevail. A more intelligent estimate of this species of property begins to spring up. Yet I am sorry to say, that there have been men—there are still some men in the community,—who would not do an immoral action, who would ,not for their lives, 'pick a flaw' in their neighbour's title-deed, and who yet make no scruple of endeavouring by every means in their power to 'pick a flaw' in his patent. That feeling is unjust, illegal, and unsocial." Speech at Trenton, N. J., March, 1852, in Goodyear v. Day [Case No. 5,569].

See, also, a beautiful defence of the rights of authors in the American Law Register for 1853–54, vol. 2, p. 129; an essay not more remarkable for its convincing strain of argument, than for its happy and dignified temper.

a book into a foreign language, as to translate it into other words in the same language. Yet, if a man were to put the identical ideas, and every characteristic of a book, except its words, into synonymes, would it escape? Independently of this, genius or labour misapplied, cannot consecrate its success. It may take a vast deal of both genius and labour to perpetrate a successful forgery, but the court would hardly hold a man of genius, who thus exercised it, the lawful owner of the property which he got. His genius, like that here, is of the sort which we say is "worthy of a better cause." The translator is wholly dependent on that which is the author's. His act at best is a voluntary and wrongful mixture of his labour with that which belongs to another, and from the result of which he can therefore claim no profit. Being a chemical as distinguished from a mechanical or separable mixture, he must lose all.

If no translation is an infringement, a work may be published in any characters different from those used by the original author, and adapted to another class of readers, without any violation of his rights. It may be published in phonographic or phonetic characters, which, while they convey to the mind of some readers the identical ideas, words, and style of the author, convey to others unacquainted with those characters, no ideas at all. Could an algebraic work be printed and published without infringement by the employment of different characters to represent the algebraic formulas? Could a treatise on chemistry, or other science purely, or indeed any work where the thought, or argument, or facts, or narrative was everything, or the great thing, and the style, language, or mode of communication nothing, or a small thing, be translated with impunity? Where is the court to stop? Take such a book as Euler's Algebra, which, dealing very largely in algebraic formulæ, a fine mathematician would in some degree understand in its original form, even though he understood not the original language—might that, if copyrighted here, be translated into a form purely English with impunity? Could a profound course of mathematical argument, set forth by algebraic process, be resolved, as it may often easily be, in the different shape of linear exhibition? Perhaps it might: but could one by printing or painting in different colours, a design invented or produced by another, escape the penalty of the act of congress for the protection of designs (Act Aug. 29, 1832, c. 263, § 3 [5 Stat. 543]), and enjoy its protection for the mere change of colours? Could a drawing, where the drawing might be everything, done in line engraving and protected by copyright, be mezzotinted or lithographed with impunity? These last are our case.

Again, unless a translation is an infringement, both the original work and the translation must be regarded, with respect to further translation, as publici juris; and the translation may be re-translated into the original language. Even in a book where the style was a great matter, the demand which would make it profitable to publish a translation would recompense such a double process of translation. In a work of science, or in any work where style was not important, the re-translation would be just as good as the original. Indeed, if as often happens with the literary composition of scientific men, the style of the book was obscure or otherwise bad, the re-translation might, with no merit in the translator, be better than the original. The author would find no protection by publishing simultaneously in two or more languages. Mrs. Stowe did actually translate this book herself into German; but she thereby only afforded encouragement and facilities to another desirous of interfering with her profits. If a translation be not an infringement, it must itself, and independently of its character quâ translation, be entitled to protection as possessing the quality of originality. But who would contend that this is so?

So far as this question depends on authority, authority is with us. Without citing the cases, it may be stated generally that the principle of them lies in this question: "Whether the work complained of could ever have existed, had not the original existed, without a coincidence in the mental conceptions and modes of expression of the original author and the alleged infringer, so striking as to be beyond all probability?" Or in this: "Whether the alleged infringer had used the literary property of another, not as a centre about which to group his own thoughts and ideas and in his own style, but as that, out of which itself, from its peculiar and intrinsic value, he has undertaken by publication to make profit for himself?" Or, to advance a step upon the last form of question, "Has the original author suffered, or will he suffer, injury from the act complained of?" Curt. Copyr. p. 240. All these tests are with us. The translator, it will be confessed, has taken our object, plan, facts, sentiments, narrative, and all our communicable style; taken, in short, everything down to our parentheses, exclamation and punctuation points. Nothing is changed but the arbitrary mechanical signs, no way connected with the essentials of anything, through which some of these are conveyed; and this is in a work where the plan, object, fact, sentiment, and narrative, is everything, and style—so far as it is incommunicable and not taken—is nothing. Undoubtedly, too, the author is injured. If it is a perfect translation, she is injured in the sale of her work; for there are numbers of people in our country who, reading two languages indifferently, will read it in that one which costs the least. If it is a bad translation, she is injured still more in her reputation; for there is another vast class who will have no conception of the book other than that which comes through a translation,

whether it cost much or little. Against both classes, so far as both classes are our own people, so far the copyright act was meant to extend. Has any one doubted that congress meant to secure to authors the profits from their work throughout the length and breadth of this country? Yet the argument of the defendant would deprive them of any profits as respects a vast class of our people; and not only so, but it would give to our population from abroad, many of them still foreigners in every sense, a privilege denied to our native citizens. It is begging the question, to say that we have secured the copyright in English, and in English alone.

The point now in controversy has been several times already adjudicated in France. M. Jules Delalain upon the law of July 19, 1793, says: "On trouve dans la jurisprudence plusieurs décisions en ce sens. Un arrêt de la cour de Rouen, (7 Novembre, 1845,) deux arrêts de la cour de Paris, (17 Juillet, 1847, et 26 Janvier, 1852,) reconnaissent aux auteurs seuls on à leur agents le droit de publier ou d'autoriser la traduction de leurs œuvres dans une langue étrangère." Legislation de la Propriété Litterare (3ime Ed. Paris, 1853) p. 5, note 2. In Lumley v. Bayard, 1 Am. Law Reg. 499, (not referred to by M. Delalain,) Donizetti had written the music of La Fille du Regiment, and Saint Georges and Bayard its French words. Both were rightfully represented at the Opéra Comique. Lumley taking the music, and by the permission of Saint Georges, but not of Bayard, translating the words into Italian, brought both out at the Theatre Italien. The question of the music was of course involved as well as that of the words. But the court is just as strong on the subject of the words as on that of the music: "The court being of opinion," says the decree, "that the opera styled la Figlia del Reggimento, and represented by Lumley at the Theatre Italien is the same as that the words of which were written by Saint Georges and Bayard, &c. * * * that the translation of the French words makes an unimportant (insignifiante) difference between the pieces; * * * that the change or translation of the words can have no influence so far as regards the composer of the music. * * * Being also of opinion with regard to the words that their authors have therein a right of property which should belong to them fully and exclusively; that if a mere translation were permitted to compete with the original," &c., were of opinion against Lumley. The court speaks of the "alteration of the words, especially when in so subordinate a form as a translation."

In England there is no doubt as a matter of fact that a translation into English of Burnett's Archæologica, written by the author in Latin, was injoined. Burnett v. Chetwood, 2 Mer. 441, note. The reasons for the injunction are not so clear; though we think that they are still clear enough. The case arose on a statute much like ours, the act of 8 Anne, c. 19. 4 Ruffh. St. 401. It is entitled an act "for the encouragement of learning by vesting the copies of printed books in the authors or purchasers of such books," &c. It recites that "printers, booksellers and other persons have taken the liberty of printing, reprinting and publishing books and other writings:" and enacts the author of any book already printed, &c., or the "printer or printers, or other person or persons who hath or have purchased the copy or copies of any books in order to print or reprint the same, shall have the sole right or liberty of printing such book or books; and that if any other person print, reprint or import any such book," &c. The act expressly provides—we may add—that it shall not prohibit "the importation, vending or selling of any books in Greek, Latin, or any other foreign language printed beyond the seas." A translation made abroad would clearly not come within it. The only report we have of the case is from the Register's Book, and from a note of counsel, reporting the argument of the defendants alone. The former shows that the grounds of applying for the injunction were that "the book was only intended to the learned, and for that reason was wrote in Latin and not in the vulgar tongue * * * and that the said translation is erroneous, and the sense and words of the author mistaken and represented in an absurd and ridiculous manner;" in other words that the author had a right to say whether his book should be translated at all, and if he was willing that it should be, then to control the manner of translation. There is nothing said in the application of the book's being of a mischievous tendency, which on an application by the author's own executor would have been of itself, at that time, probably, as now certainly, an answer to any application for an injunction; whatever it might have been to an application from the crown. When the case came to be argued, counsel opposed to the application argued that the copy-right act was "intended only to restrain the mechanical art of printing * * * but not to hinder a translation of the book into another language, which, in some respects, may be called a different book, inasmuch as some skill in language is requisite thereto * * * that the translator dresses it up and clothes the sense in his own style and expression." Lord Chancellor Parker—responding, clearly, to the argument, and, in a qualified way, granting it for argument's sake—said, "that though a translation might not be the same with the reprinting the original * * * yet this being a book which to his knowledge, (having read it in his study) contained strange notions intended by the author to be concealed from the vulgar in the Latin language, in which language it could not do much hurt * * * he thought it proper to grant an injunction." He put

in afterwards, to be sure, in an adjectitious form, "that he looked upon it that this court had a superintendency over all books, and might in a summary way restrain the printing and publishing of any that contained reflections on religion and morality." But the moving ground of the injunction was the intention of Dr. Burnett.

Several text writers, American and foreign, are of opinion that a translation like this is an infringement. Mr. Curtis (on Copyright. 292), of our own country, puts the question: "Does the mere act of giving to a literary composition the new dress of another language, add to the case an element which ought to take it out of the rule by which reproduction in other forms is prohibited?" He thus resolves it negatively: "To attribute to such a new medium the effect of entire originality, is to declare that a change of dress alone annihilates the most important subject of his right of property. It reduces his right to the narrow limits of an exclusive privilege of publishing in that idiom alone in which he first publishes. But we do not find that his privilege is thus circumscribed; because a mere change of phraseology is not held to justify the adoption of matter that is under the protection of law." The French jurists, Pardessus (Droit Commercial, tit. 1, Nos. 164, 167), and Etienne Blanc (Traité de la Contrefaçon, 416), hold this same opinion. The counsel on this side, made also a learned examination to the question of copy-right at common law, and independent of the statutes securing it.

Mr. Goêpp and B. H. Brewster, contra.

The act of congress speaks of reprinting such books as the author had previously printed: and the prohibition is only against printing, publishing or importing "any copy of such book." In no parlance—either ordinary or legal—does "copy" mean "translation:" and the act of congress does not enact that a translation shall be considered a copy. On the contrary, it uses the term "copy" clearly in the sense of reprint. On principle a translation is not an infringement. The subject of a book is confessedly not capable of copy-right. Writing and thinking are separate things, and the results of distinct gifts and of separate labours. Thought is the gift of heaven; style or ease in writing, comes from art. The thought may be more meritorious than the style; but the thought, independent of its language, cannot be protected; and therefore literary property attaches not to the thoughts as expressed, but to the expression of the thoughts; that is, to the language in which they are conveyed. A book which had little or no thought, would as much be the subject of copy-right, as if it was the Essays of Francis Bacon: and a copy or reprint of it, would be as completely within the statute, as if it contained the profoundest, the most original

and inestimable discoveries or truths. This may arise from the inability of men to secure perfect justice on earth; but it is necessary to secure the greatest measure of justice which we can.

There being here no question of a verbatim copy or of colourable variations, the only question is whether there is a servile and mechanical imitation. We have confessedly taken not a part, but the whole. We concede and we boast that we have taken every sylable, comma and i-dot of the original. The question cannot be how much we have taken, for we have taken all; nor how much we have added, for we have added nothing: but only how have we taken, and what have we done with it? The criterion given by Lord Lyndhurst (Jollie v. Jaques [Case No. 7,437]; D'Almaine v. Boosey, 1 Younge & C. Exch. 288–300) is "whether the appropriation could have been made by a mere mechanic in literature, or whether it required the aid of genius and reflection?" Is the work such as any body, if ordered, like a tradesman or mechanic, to make it, would have produced substantially in the same shape as at present? Or is it such as would not have had the same merits and the same character, if produced by any body but the one who did produce it? In the former case it is servile. In the latter it is the creation of genius. This is not the case of an almanac, or a collection of chemical recipes, or a set of algebraic or nautical calculations, in which every word is a term of science, and has an exact correlative, which may be found by a mere mechanical exercise, analogous to that of a printer, when he seeks a type corresponding to the written character. A translation of a romance, or any like work, depends entirely for its success upon its individuality, and for that reason, is original with the translator.

It is settled that translations of books, not copy-rights, are subjects of copy-right (Wyatt v. Barnard, 3 Ves. & B. 77); and in this respect they are undistinguishable from other works. To exclude us from the benefit of the rule, is only possible on the basis of an alleged distinction between translations from originals not copy-righted, and translations from originals secured. The distinction is unfounded in authority. In principle it proves too much, for it would make reprints (which are mere copies) from foreign works, legitimate subjects of copy-right. It will not do to say, that a translator is a copyist, so far as he appropriates, and an author, so far as he contributes his own exertion. Every copyist, every reprinter contributes his own exertion, and every author appropriates thoughts from others. The argument would result in subjecting a translator to prosecution by those from whom he has translated, and at the same time allowing him to take advantage of his own wrong, by prosecuting those who reprint his translation. There is no hybrid between a thief

and a thinker. Author and copyist are irreconcileable opposites. If a translation were a copy, it would, under any circumstances, be incapable of copy-right. Having, under some circumstances, been adjudged capable of copy-right, it has been adjudged to be no copy under any.

The author's rights are not injured. A translation enhances the value of the original. None will buy the former who are able to read the latter: and the translation attracts the notice of many to the original. If Mrs. Stowe had not thought so, she would not herself have published a German translation. The sale of her translation, indeed, was impaired; but we are not charged with a piracy of it: and the reason why it is injured, is that her translation has less genius than ours.

The analogy of a mechanical or chemical mixture is untenable. A mechanical mixture may be said to have occurred when the translator bought the book; but this cannot be complained of, because the monopoly of selling it, is the very subject of the claim. A chemical mixture took place, if at all, when he read it, and it became amalgamated with his own mind; when, by the communication—which is the soul and essence of the book—the ideas of the writer were imparted to the reader. But to complain of this, would be to complain of the very purpose of the copy-right law itself; the monopoly of reproducing the material, mechanical engine of the communication, the body of the book, was granted for no other consideration than the general diffusion of the communication itself. Anything, therefore, which legitimately ensues upon the reading of the book, is publici juris, and outside of the author's privilege. A book may be copied and reprinted without being read; but must be read to be translated or abridged. Translation or abridgement is, if any thing, an organic, germinating process, entirely outside the circle of the law on bailments.

On authority: Burnett v. Chetwood, cited on the other side, is really no authority for any thing; or, if authority, is for us. The petition for injunction, puts the case on Dr. Burnett's intention to keep his book locked up in a learned tongue, and upon the injury which the translation brought upon his character, by his sense and words being "mistaken and represented in an absurd and ridiculous manner." But the lord chancellor grants no injunction on those grounds. He travels out of the record to find other ground for his decision, and introduces a new element, to wit, that having himself read the book, he knew it to contain strange notions, which, while they were in the Latin tongue, "could not do much hurt;" but which, he implies, if translated, would be very noxious. He treats the book as one containing "reflections on religion and morality," and therefore within his summary control, as a guardian of public morals. To say the least, he seems to have had serious doubts whether, on the ground set forth by the petition, he could interfere; and to have been pressed by the consideration that a translation was not within the act, because the translator had bestowed "care and pains" upon his work.

Mr. Curtis, of our own country, though his book is laborious and valuable, goes to lengths quite untenable on the subject of protection to authors. His opinion on translations is in conflict with Mr. Godson, the English author. As to the cases cited from France, it is enough to say, that we know nothing of the words of the legislative enactments on which they are founded. And with respect to the speculations of its text writers, that the speculations of one are answered by the speculations of another; that while the name of Pardessus is found on one side, that of Renouard, which "weighs as much," and "sounds as well," is ranged upon the other. See Curt. Copyr. 293.

GRIER, Circuit Justice. In the balance of opinions among learned jurists, we must endeavour to find some ascertained principles of the common law as established by judicial decision on which to found our conclusion.

In order to decide what is an infringement of an author's rights, we must inquire what constitutes literary property, and what is recognised as such by the act of congress, and secured and protected thereby.

An author may be said to be the creator or inventor, both of the ideas contained in his book, and the combination of words to represent them. Before publication he has the exclusive possession of his invention. His dominion is perfect. But when he has published his book, and given his thoughts, sentiments, knowledge or discoveries to the world, he can have no longer an exclusive possession of them. Such an appropriation becomes impossible, and is inconsistent with the object of publication. The author's conceptions have become the common property of his readers, who cannot be deprived of the use of them, nor of their right to communicate them to another clothed in their own language, by lecture or by treatise.

The claim of literary property, therefore, after publication, cannot be in the ideas, sentiments, or the creations of the imagination of the poet or novelist as dissevered from the language, idiom, style, or the outward semblance and exhibition of them. His exclusive property in the creation of his mind, cannot be vested in the author as abstractions, but only in the concrete form which he has given them, and the language in which he has clothed them. When he has sold his book, the only property which he reserves to himself, or which the law gives to him, is the exclusive right to multiply the copies of that particular combination of characters which exhibits to the eyes of another

the ideas intended to be conveyed. This is what the law terms copy, or copyright. Curt. Copyr. 9–11, et seq.

The statute of 8 Anne, c. 19 (which so far as it describes the rights and property of an author, is but declaratory of the common law), is entitled, "An act for the encouragement of learning, by vesting the copies of printed books in the authors, &c." It gives the author "the sole right of printing and reprinting such book or books," and describes those who infringe the author's rights, as persons "printing, reprinting, or importing such book or books" without the license of the author. Our acts of congress give substantially the same description both of the author's rights and what is an infringement of them.

Now, although the legal definition of a "book" may be much more extensive than that given by lexicographers, and may include a sheet of music as well as a bound volume; yet, it necessarily conveys the idea, of thought or conceptions clothed in language or in musical characters, written, printed or published. Its identity does not consist merely in the ideas, knowledge or information communicated, but in the same conceptions clothed in the same words, which make it the same composition. 2 Bl. Comm. 406. A "copy" of a book must, therefore, be a transcript of the language in which the conceptions of the author are clothed; of something printed and embodied in a tangible shape. The same conceptions clothed in another language cannot constitute the same composition, nor can it be called a transcript or "copy" of the same "book." I have seen a literal translation of Burns' poems into French prose; but to call it a copy of the original, would be as ridiculous as the translation itself.

The notion that a translation is a piracy of the original composition, is founded on the analogy assumed between copy-right and patents for inventions, and where the infringing machine is only a change of the form or proportions of the original, while it embodies the principle or essence of the invention. But as the author's exclusive property in a literary composition or his copyright, consists only in a right to mu'tip'y copies of his book, and enjoy the profits therefrom, and not in an exclusive right to his conceptions and inventions, which may be termed the essence of his composition, the argument from the supposed analogy is fallacious. Hence, in questions of infringement of copyright, the inquiry is not, whether the defendant has used the thoughts, conceptions, information or discoveries promulgated by the original, but whether his composition may be considered a new work, requiring invention, learning and judgment, or only a mere transcript of the whole or parts of the original, with merely colourable variations. Hence, also, the many cases to be found in the reports, which decide that a bona fide abridgment of a book is not an infringement of copyright.

To make a good translation of a work, often requires more learning, talent and judgment, than was required to write the original. Many can transfer from one language to another, but few can translate. To call the translations of an author's ideas and conceptions into another language, a copy of his book, would be an abuse of terms, and arbitrary judicial legislation.

Although the question now under consideration, was not directly in issue in the great case of Millar v. Taylor (4 Burrows, 2303), yet the inference that a translation is not an infringement of copyright, is a logical result, and stated by the judges themselves as a necessary corollary, from the principles of law then decided by the court. That case exhausted the argument, and has finally settled the question as to the nature of the property which an author has in his works; and it is, that after publication, his property consists in the "right of copy," which signifies "the sole right of printing, publishing and selling his literary composition or book," not that he has such a property in his original conceptions, that he alone can use them in the composition of a new work, or clothe them in a different dress by translation. He may be incompetent to such a task, or to make a new work out of his old materials, and neither the common law nor the statute give him such a monopoly, even of his own creations.

An author, says Lord Mansfield, has the same property in his book, which the king has to the English translation of the Bible. "Yet if any man should turn the Psalms, or the writings of Solomon, or Job, into verse, the king could not stop the printing or sale of such a work. It is the author's work; the king has no power or control over the subject-matter. His power rests in property. His whole right rests upon the foundation of property in the copy." Mr. Justice Willes, in answer to the question, "Wherein consists the identity of a book?" says, "Certainly, bona fide imitations, translations and abridgments are different, and in respect of property, may be considered new works." And Mr. Justice Aston observes: "The publication of a composition does not give away the property in the work. But the right of copy still remains in the author. No more passes to the public from the free will and consent of the author, than unlimited use of every advantage that the purchaser can reap from the doctrine and sentiments which the work contains. He may improve it, imitate it, translate it, oppose its sentiments; but he buys no right to publish the identical work."

The distinction taken by some writers on the subject of literary property, between the works which are publici juris, and of those which are subject to copyright, has no foundation, in fact, if the established doctrine of the cases be true, and the author's prop-

erty in a published book consists only in a right of copy. By the publication of Mrs. Stowe's book, the creations of the genius and imagination of the author have become as much public property as those of Homer or Cervantes. [Uncle Tom and Topsy are as much publici juris as Don Quixote and Sancho Panza.] [2] All her conceptions and inventions may be used and abused by imitators, play-rights and poetasters. [They are no longer her own—those who have purchased her book, may clothe them in English doggerel, in German or Chinese prose. Her absolute dominion and property in the creations of her genius and imagination have been voluntarily relinquished.] [2] All that now remains is the copyright of her book; the exclusive right to print, reprint and vend it, and those only can be called infringers of her rights, or pirates of her property, who are guilty of printing, publishing, importing or vending without her license, "copies of her book." A translation may, in loose phraseology, be called a transcript or copy of her thoughts or conceptions, but in no correct sense can it be called a copy of her book.

Bill dismissed, with costs.