### HENRY BILL PUBLISHING CO. v. SMYTHE.

*(Circuit Court, S. D. Ohio.    July 3, 1886.)*

1. COPYRIGHT—MONOPOLY OF SALE—INFRINGEMENT BY OTHER DEALERS.

    If the owner of the copyright wishes to sell the published work directly and only to individual subscribers, the statute protects him from interference by other dealers who offer surreptitiously obtained copies of the genuine work without his consent, unless there be something in the circumstances of the particular case to estop him from relying on the privileges of his monopoly.

2. SAME — SALE BY SUBSCRIPTION—BREACH OF TRUST BY AGENT—FRAUDULENTLY SOLD ·COPIES OF THE GENUINE WORK—NOTICE.

    The defendant procured genuinely printed copies of Blaine's "Twenty Years of Congress," the copyright of which belonged to the plaintiff, who sold the work only by subscription to single buyers, from a dealer who had obtained them by purchase of an agent of the plaintiff to whom they had been sent for delivery to such subscribers, but without the knowledge or consent of plaintiff and against its instructions to the agent, and in violation of his agreement with the plaintiff not to disobey its instructions in that respect and of his bond to that effect, of which fraudulent conduct the defendant had no notice; but he abstained from making any inquiry into the circumstances of the dealer's possession and right to sell, well knowing that the plaintiff owned the copyright and refused to sell otherwise than by subscription. *Held,* that he would be enjoined from selling these copies, and to account for the profits; that the above-stated circumstances required that he should have made inquiry, and that the failure to make such inquiry was equivalent to notice of the facts; but that the court had no power to enjoin the defendant from future dealing in the work without the consent of·the plaintiff, or from any future interference with the trade of plaintiff's agent in the city where defendant resided.

3. SAME—CONDITIONAL SALES.

    If the owner of the copyright undertake, by contract, to attach conditions of restriction to his sale of copies of the work, as, if he sells to canvassers upon agreement that they shall sell only by subscription, he must rely solely on the ordinary remedies for a breach of that agreement, and it is not within the protection of the copyright act.    But it is otherwise if he sell the copies directly to subscribers through agents having no ownership of the copies sold, as in this case.    The incidental protection of the statute belongs only to the owner of the copyright or some part of it, and cannot be transferred by him to mere owners of the copies having no interest in the ownership of the copyright.

In Equity.

The plaintiff is the owner of the copyright of a book, written by James G. Blaine, called "Twenty Years of Congress," and sold it by subscription only, to individual buyers of single copies.    The book had never been otherwise placed upon the market by the plaintiff, or with its consent.    It employed agents to solicit subscriptions and deliver the copies ordered, assigning to each a certain territory.    An agent so employed in New York, to whom plaintiff had sent a number of copies for delivery to certain subscribers procured by him, sold the copies to a book-dealer, in Troy, contrary to plaintiff's instructions, and in violation of an express agreement and his bond that he would not sell or deliver in any other mode than that directed by the plaintiff, applying the money to his own use.    It does not appear whether the Troy dealer was aware of this breach of trust or a party to it by

collusion with the agent, but it does appear that it was generally known to the trade, and especially to defendant, that the plaintiff professed to sell the book only by subscription, and had announced by public advertisement and otherwise that in no other way could it be procured from the publishers. The defendant had expressed the belief that the trade could procure the work notwithstanding this announcement, and that he would soon have it for sale. He ordered the book from the Troy merchant, procured six copies of those purchased from the plaintiff's agent in the manner above stated, and sold five of them at a profit of $5.86. The defendant testified that he was not aware of the facts connected with the Troy dealer's purchase, and there is no proof that he was. He ordered the books without any inquiry upon the subject, and in the usual way of making such orders. The plaintiff's agent at Columbus, Ohio, where defendant does business, notified him that he was the only authorized agent for that section; that the book was sold only by subscription, and warned him not to sell the copies he was offering; but that agent did not himself know how the books had been procured. This bill was filed to enjoin the defendant from selling those copies; for an account, if sold; and from selling the book at all, in the future, without plaintiff's authority. The answer and proof developed the foregoing facts.

*D. Stalter* and *Pugh & Pugh*, for plaintiff.

*J. M. Tibbitts*, for defendant.

HAMMOND, J. It is proper that I should frankly say, by way of apology for a too long delay in the decision of this case, that when it was argued I felt, because of my unfamiliarity with the law of copyright, quite unwilling to assume the responsibility of its decision without an investigation, which has been until now, in the multitude of my other engagements, impossible. To me it was a startling proposition that, in the immense trade that goes on in copyrighted books, the dealer must deraign his title to each copy from the copyright holder with all the particularity of real estate, if not more inexorably, and that no right to use or sell a copy could be acquired without his consent; and I did not see how the argument of the plaintiff could stop short of that claim; and yet I am unable now to see how that monopoly of sale granted by the statute can be secured without a principle almost as broadly stated as that, qualified, of course, by such limitations as may properly and justly should be imposed to estop him, by his own conduct in any given case, from relying on the principle just stated.

How can his right of sale be *exclusive* without that principle in its widest scope? If I own a horse, or 10,000 horses, I have, to be sure, growing out of the very right of property itself, an exclusive right to sell them within the United States, and, indeed, elsewhere. But, surely, this is not the measure of that exclusive right to sell his works

which is granted to an author by the copyright statute. He would have that right, as an incident to his property in the printed copies of the book, without the statutory grant, the other grants of the statute remaining as they are, to create or secure the other elements of his peculiar property in them. Indeed, it is my opinion that from the essential nature of copyright itself would spring this principle of exclusive sale, as I have formulated it, without the especially expressed grant of the statute in that respect.

I cannot find that the English act in terms confers a monopoly of *sale*, as ours does; and yet, I think, it exists by implication from the statutes as fully as it does under our act. I may be mistaken as to the phraseology of the English acts, but 5 & 6 Vict. c. 45, wherever I find it, seems to omit the words used in our act in reference to the sole liberty of *"vending"* the book copyrighted, as it does many other words there used to define the franchise granted by congress. But while the act of Victoria defines "copyright" to mean "the sole and exclusive liberty of printing, or otherwise multiplying, copies of any subject to which the said word is herein applied," our act of congress uses the language, much amplified, however, of *Millar* v. *Taylor*, 4 Burr. 2303, and defines the word to mean the sole right of "printing, publishing, and *selling* his literary composition or book." Quoted by Grier, J., in *Stowe* v. *Thomas*, 2 Amer. Law Reg. (O. S.) 213, 230; S. C. 2 Wall. Jr. 547; *Graves* v. *Ashford*, L. R. 2 C. P. 410, 417; Drone, Copyr. 100, 338, 662, 700; Rev. St. § 4952.

Copyright and literary property would be of little value, for want of adequate protection, without this principle, and it must therefore attach to, and be one of, the peculiarities of this creation of the statute. Ordinary remedies protect one's exclusive right to sell his horses, or, what is the same thing, are a sufficient protection to that character of property; but in printed books there is, aside from the material property in them, a peculiarly intangible and incorporeal right pertaining to the authorship,—a property created by this statute, —which requires a further protection that can be adequate only when it is understood that no one can read this book, buy it, or sell it, or otherwise use it, or any copy of it, either that which is piratically or that which has been lawfully printed, without the consent of the author or copyright holder; and the basis of it is that a moneyed or other valuable consideration must be paid to the author, and he has a right to receive value for any use of the product of his labor. Protection in the monopoly of sale for the lawfully-printed copies is just as essential to the value of the right of property created by the statute as protection against piratical printing, publication, and sale of the book. Or, if this be not so, congress has chosen, at least, to grant that right of monopoly, and it may grant what it pleases. It does the same thing for mechanical inventions, and why not for literary products? I think it has. Under our tariff laws an American manufacturer has often a monopoly of the American market, and he

stands very much as the copyright holder does, only the latter has a much stronger, and a more extended and enlarged, monopoly. He relies upon the pains and penalties of the revenue statute for his enjoyment of the monopoly; but, if congress had the same power as in copyright legislation, it might go further and protect the manufacturer more directly and efficiently.

To return to the illustration of the property in horses. If, under the tariff laws, all importations should be forbidden, the American owner of horses would, indeed, have a monopoly of the market. But suppose the government could or should go further, and prohibit all persons, except one citizen, from raising or reproducing horses, and should suppress all reproduction than his own, there would then be growing out of the legislation a monopoly of sale analogous to that conferred in direct terms by this statute on the copyright holder of a book. If the statute should stop at prohibitory legislation, the beneficiary of the monopoly would be compelled to depend wholly on the ordinary remedies to protect it. But this statute does not stop there, and gives the copyright holder especial, if not extraordinary, remedies, at law and in equity, to protect his property, not only against infringement by piracy, but, as I think, against unauthorized sales of genuinely printed copies.

This statute has not abrogated the ordinary law of sales in its relation to copyrighted books, and, like all property, this is subject to that law; but it has provided for it likewise a law of its own, by necessary implication from the statute. We are all familiar with the rule that one buying property of a thief gets no title, no matter how innocent he may be of all knowledge of the theft. Now, let us imagine a state wherein this rule of law has been abrogated by enacting that one who so buys, for a valuable consideration, without notice, shall have a good title, the state undertaking to satisfy our sense of justice by some kind of compensation to the unfortunate owner. If, now, in that state, some thief should sell copies of Mr. Blaine's book, stolen from him there, the purchaser would not get a good title to them notwithstanding the state law; and this because, under the act of congress, Mr. Blaine had granted to him by the statute the exclusive right of sale, which right the courts would protect by appropriate remedies. I do not stop to inquire whether he could bring replevin, trover, detinue, or the like, on the theory that the constitution and laws of the United States being paramount, and Blaine's right of sale *exclusive,* the federal law would exclude the thief's power of sale under the state statute, and there would therefore be necessarily a modification or limitation imposed by the federal statute on that of the state; but, surely, he could appeal to the remedies given by this copyright statute itself to protect him in its enjoyment. Again, if this be a correct view of the nature of this grant of an exclusive right to sell, it does not matter whether the party offering to sell without Mr. Blaine's authority be a thief, or one in possession only by a breach of trust, or

or some other less blamable means of acquisition. The absence of Mr. Blaine's authority to sell his literary property constitutes the defect of title, no matter how that want of authority arises. Owing to the peculiar character of this kind of property, the absence of the author's authority to sell is a defect of *title*, and not a mere want of power. In other words, this monopoly of sale is, of itself, property, and any interference with it should be restrained.

Now, as to what should estop Mr. Blaine, in a court of equity, as between himself and a given party in possession of his books claiming the right to sell them, from relying on any absence of authority from him to sell, or as to what circumstances would enable such a party to invoke the aid of that court to restrain Mr. Blaine from setting up such an absence of his authority, we need not inquire further than the facts of this case demand a decision. It may be that a court of equity would often presume the necessary authority to sell, whether it existed in fact or not; but this would depend rather on Mr. Blaine's own conduct in the premises than anything else. If he has put his copies of the book on the market in such a way as to mislead persons who wish to deal in them as to his authority to sell any particular copies found in the market; if he has sold them by wholesale and retail to merchants; placed them with brokers, factors, auctioneers, jobbers, or other agents, for general sale to all who apply; and the defendant buys from any of these without notice of any defect of title or authority to sell them,—it might be that Mr. Blaine would be without remedy to assert his monopoly in the given case, because estopped by such conduct. The defendant, in such cases, might have a right of sale by estoppel, but the principle we are considering would remain.

And it must not be forgotten, in measuring the equities between parties in all such cases, that while it might be impossible, under some circumstances, to trace the title of each book and its accompanying authority from its author to sell it, this statute has provided ample notice of the author's right; for every book carries the imprint of that notice upon it, and this by the command of the statute. This fact is sufficient, and was intended to put every man who wishes to deal in the book—indeed, every man who wishes to own or read a copy —upon notice that Mr. Blaine owns the copyright, or has transferred it to his publishers, and imposes the duty of reasonable inquiry into the facts of the case to know whether he has been paid or satisfied as to the proposed sale or use, in the matter of his compensation therefor. I do not think, therefore, that the bare fact of the want of actual notice of the defect in the title on the part of the defendant is an answer, in any case, to the plaintiff's claim of infringement; but the scrutiny should go further, and determine whether the statutory notice of the plaintiff's title imprinted in the book has been fairly treated, by especial inquiry, if that inqury be reasonably demanded by the circumstances of the particular case. I should not

be prepared to say that in this peculiar class of cases the being put upon inquiry is equivalent to notice of plaintiff's rights as to particular copies of the book, but only that equity demands that there shall be, on both sides, reasonable conduct in respect to the dealings of the parties with each other, so that there shall be investigation into the facts relating to the author's authority to sell the book by every one who proposes to deal in it, whenever the circumstances fairly demand that course of business. In this case the circumstances did fairly demand such an examination, and it is useless to decide on the proof whether there was or was not, on the part of the defendant, want of actual notice of the facts involved. He knew that the plaintiff owned the copyright of Mr. Blaine's book; that it had never placed it on the market for general sale by the trade, but had studiously avoided doing that, and had sold it only by subscription to actual subscribers. It had a right to do this, and it was supposed to be a most effectual method of enjoying the monopoly in the profits of the sale which the statute gave. In this way, presumably, the plaintiff would reap the whole profits of the sales, excluding all other dealers and all middle-men, as it had a right to do, from any share of those profits; and, if persistently adhered to, the only copies of the book that could come into the general trade, with the essential authority of the plaintiff to use or sell it, would be those copies sold by subscribers at second-hand, such sales being authorized as an incident of each subscriber's property in his particular copy.

It is quite true that the general trade may not be able to identify those copies which are regularly on the market at second-hand from those which may otherwise surreptitiously come into market, but a little inquiry by mail or telegraph of the copyright holder, and of the dealers offering the book otherwise than by subscription, would generally develop the true facts, and disclose whether particular copies were offered with the essential authority of the copyright holder. In all fairness this inquiry should be made, and, in the absence of it, any infringement of the copyright holder's monopoly of sale cannot be justified by want of actual notice. Here the defendant would have found, by actual inquiry, that these copies he offers to sell were surreptitiously purchased of a fraudulent agent for delivery only to subscribers, and therefore were not authorized for sale in the general market. Technically, the dishonest agent may not have been a thief, and the books were not stolen; but substantially they were stolen from the plaintiff. There is no proof in the case that any conduct of the plaintiff about placing their books on the market was calculated to mislead the defendant, either generally, or as to the particular territory wherein these copies were purchased, and he could not, I think, shut his eyes and ears, keep his tongue silent, and rely on any belief thus acquired that the person from whom he bought had authority to sell. It was a convenient assumption; but his knowledge of the trade, and of the methods adopted by the copyright holder as to this book,

preclude him from relying on it without further inquiry than he shows he made. His experience that all subscription books may be procured for sale in the general market, or his belief of that fact, cannot avail him as a defense here, nor justify his attempt to verify that belief as to this book, by this transaction.

It is useless to inquire whether, under the ordinary law of sales of personal property, the circumstances were such that a purchaser without notice would obtain a good title. As ordinary property, unaffected by the copyright statute, we could have no concern with that feature of this controversy, for, the amount being less than $500, we would have no jurisdiction. But I have endeavored to show that, outside of and beyond the general law, whatever it may require, the author or his assignee has a special property in his literary work, about which this statute has gathered characteristics, incidents, rights, and remedies which are peculiar to itself, and not affected by the general law. The leading case of *Stephens* v. *Cady*, 14 How. 528, S. C. *sub nom. Stevens* v. *Gladding*, 17 How. 447, well illustrates this. There, the purchaser at an execution sale of the copper-plates from which a copyrighted map could be printed, did not acquire the right to print copies of the map and sell them. See, also, *Ager* v. *Murray*, 105 U. S. 126. No more, it seems to me, can the fraudulent agent for the delivery of copies already sold to particular persons transfer a right to sell them to other persons, which he had not himself possessed, when he deserts his trust, and embezzles the books by selling them to a merchant. If the merchant know of facts that put him on inquiry,—as the fact that this was an existing copyright, under which copies were or had theretofore been sold only by subscription, fairly did,—certainly he should be chargeable as if he were fully informed.

I agree that where one of two persons must suffer by the fraud of an agent, the principal who created the agent should suffer rather than an innocent third party. But a dealer in books, who undertakes to circumvent the author in the execution of any plan that he may adopt—no matter what plan it be, so it be an honest one—for the enjoyment of his monopoly of sale, by showing his skill in the procurement of copies for sale outside of that plan, is hardly an innocent party, when his skill to do that thing requires that he shall purchase through an unfaithful agent, and omit or neglect all inquiry as to the circumstances which enable him to exhibit it at all, as this defendant did. He announced his belief that the books could be procured without individual subscription. He promised to have them for sale, and, in a sense, his pride of opinion was involved in his boast that he could do what he had promised to do. He ordered these books from a comparatively out-of-the-way dealer, who had procured them by fraud upon the plaintiff's well-known and scrupulously followed scheme of marketing them, and now he insists that he did not know of the fraud, when he had made no inquiry as to the peculiar

fact that these books could be so procured for sale at all. He did not inquire, because he knew that it was dangerous to inquire, and with him ignorance was bliss, so long as he could make good his boast to exhibit the book for sale in spite of plaintiff's determination that he should not so sell it, and of the selection of a rival dealer in the same city as its agent to sell by subscription within that territory. This smartness of trade might succeed as to common articles of merchandise, afloat on the seas of commerce, notwithstanding any restrictions of contract on the agents in possession; but even this is doubtful, where the circumstances invite or demand further inquiry; but with a book, protected by copyright, it will not do. The precise ruling I make is this: If the owner of a subsisting copyright seeks to enjoy his exclusive right of selling the published work by making sales directly and only to individual subscribers, the statute protects his plan of sale from interference by other dealers offering surreptitiously obtained copies of the genuine work without his consent, unless there be something in the circumstances of the particular case to estop him from relying on the privileges of his monopoly.

I derive support for this ruling from a mass of cases and authorities on the nature and incidents appertaining to property in copyright too numerous for citation. None of the learned counsel cited a case directly in point, and, after much laborious and patient search, I have been unable, with my somewhat limited facilities, to find one. The citations of counsel from our decisions on patents seem plausible and forcible, as analogies, but, in view of what the courts have said about false analogy in that direction, I have discarded those decisions for fear of being misled by them. *Baker* v. *Selden*, 101 U. S. 99; *Stowe* v. *Thomas, supra;* 8 Amer. Law Reg. (O. S.) 229; Id. 225; Brewster, *arguendo, Lawrence* v. *Dana*, 4 Cliff. 178; *Shepherd* v. *Conquest*, 17 C. B. 427, 444,—where the analogy is vigorously denied. But it is worthy of suggestion that perhaps the anology is less at fault in this incident of a monopoly of sale than in other features of similarity. Protection for both is secured by the same clause of our constitution, in language that indicates association of thought, to say the least of it. Const. art 1, § 8, cl. 8.

If it be said that this is "protection run mad," as was argued in the case of *Stowe* v. *Thomas, supra,* and as has been, in other language, earnestly urged in argument here, with greater force of application, it may be said, in reply, that albeit "the act of Anne owes its origin to Dutch influence and customs respecting monopolies, which came in with William III., and was passed in the same year with an act to protect wig-makers by prohibiting men from wearing their own hair,"—Goepp, *arguendo,* 2 Amer. Law Reg. (O. S.) 222, —congress has direct authority in the above-cited section of the constitution for protection to literary property to any extent it may choose, it being alone the judge of that extent; and therefore any odium of the disputed power to protect the wig-makers in a monopoly should not be

visited on this statute. Certainly, congress may prohibit any owner of the paper, twine, and leather called a "book" from selling, using, or enjoying, even by reading, if congress choose, the printed words used to express the ideas therein, until the author has received his compensation in money for his labor in producing those ideas. The only question is the extent to which congress has gone in the legislation under consideration. The purchaser of the paper, leather, and twine does not necessarily purchase the literary property, and he cannot use his ownership of the one to defraud the author of his property in the other. This case illustrates the necessity for maintaining that distinction. Mr. Webster said it was no more an odious monopoly for a man to own his invention—and, we may add, his copyright—than to so possess his homestead. 2 Wall. Jr. 549, note. The principle of protection, as I have sought to apply it, would be fully recognized and conceded in any case of piratically printed copies. Why does it not just as well apply to genuinely printed copies, unlawfully or surreptitiously obtained from the author? I should not hesitate, for my part, to call the latter proceeding a "piracy" or "infringement" of the copyright; but as these words are generally applied to an unauthorized copying of the work, it may be well enough to adopt a suggestion made in argument in *Lawrence* v. *Dana, supra,* 4 Cliff. 27, and call this an "interference" with the copyright. However, it may well be called a "piratical" adventure, judged by its result, which is said in *Scott* v. *Stanford,* 3 Eq. Cas. 718, to be the true test of infringement, and that the absence of any dishonest intent is immaterial if the result of the appropriator's conduct be to injure the author's right of sale. The author is just as much injured by being deprived of the price of a genuine copy as by having a piratical copy substituted for it, so far as his moneyed interest is concerned; and BRETT, M. R., said, in *Duck* v. *Bates,* 13 Q. B. D. 843, that what was intended to be protected was the value of the author's invention, which is the key to the construction of the act, and that he does not want sentimental protection.

I have endeavored, without success, to trace the case of *Murray* v. *Heath,* 1 Barn. & Adol. 804, by citation in some more modern case. Mr. Drone cites it as raising the question "whether a seller is liable for the unauthorized sale of copies which have not been unlawfully printed or imported." Drone, Copyr. 479. He criticises it as unsound, if it undertakes to establish "that the defendants were not guilty of piracy because the copies had been printed from the original plates;" and cites *Stevens* v. *Gladding,* 17 How. 447, as enunciating the correct rule on that subject. That case, certainly, does construe our statute less strictly than the English statute was construed, and I have already pointed out a difference in the language of the two. But, however this may be, and I do not think there is any substantial difference in the privilege of exclusive right of sale between the English acts and our own, except that ours give directly what the

others necessarily imply, the court, in *Murray* v. *Heath, supra,* was evidently dealing with a different case from that we have in hand. It is a doctrine running through all the cases that whenever the owner of the copyright undertakes, by contract, to attach conditions to his sale of copies of the work, he must rely on the ordinary remedies for a breach of the contract, if it be violated; and this is sound doctrine. Inseparably with the transfer of the title in any copy of the work must go the right of alienation, so far as the peculiar protection of the copyright statutes is concerned; and the conditional or other sales mentioned by CLIFFORD, J., in *Parton* v. *Prang,* 3 Cliff. 537, 550, to which literary property, like all other personal property, is liable, are not cognizable as copyright cases, when disputes arise growing out of the power of alienation or sale under those contracts. For example, in the last case cited, the artist had a literary property in his painting which he sold without condition. It was not under the protection of our statutes as they then stood; but, if it had been, the ruling must have been the same, for, having parted with his whole title, the right of use was absolute. It is not like the sale of a part and the retention of a part of the property in the copyright, but the sale of the whole estate or interest in certain products of the copyright, with conditions attached. So, in this case of *Murray* v. *Heath, supra,* the bankrupt had been allowed to keep as his own property the genuinely printed copies retained by him. With this ownership, so far as the copyright statute was concerned, passed the right of sale; but the bankrupt agreed he would not sell them, and while it was a clear breach of this agreement for his assignees to offer them for sale, it is plain that the copies were no longer under the protection of the copyright statute. The author had parted with all he had under that statute, namely, his ownership of those particular copies, both in their material make-up and the literary property they represented. Or, as it is often expressed as to inventions, those particular copies had been, by his gift, taken "out of the domain" of the copyright laws, and placed exclusively within that of ordinary property. I do not mean to say that a copyright owner may not sell a part and retain a part of his copyright, by defeasible or conditional contracts for that purpose, but only that in that case the contract was not of that character.

Another illustration is found in *Taylor* v. *Pillow,* 7 Eq. Cas. 418, where one sold his copyright at auction, but retained copies already printed. As to those copies he had, like any other owner, an inseparable right of alienation by sale, and if he had agreed not to sell them, it would not have put that agreement under the protection of the copyright statute. Again, in *Howitt* v. *Hall,* 10 Wkly. Rep. 381, S. C. 6 Law T. (N. S.) 348, which I have not seen, and must take at second-hand, the author had parted with his copyright "and the exclusive right of sale" for four years, but the assignee was allowed to sell his stock left unsold at the expiration of the term of four years. 1 Jac. Fish.

Dig. 793; 2 Jac. Fish. Dig. 2398. On the other hand, *Hudson* v. *Patten*, 1 Root, 133, well illustrates the reverse proposition of this principle. The plaintiff in that case owned the copyright for a given territory, and another owned it for a different territory. The latter employed the plaintiff to print for him a number of copies, to be sold in his own territory, but the defendant, having purchased them, sold them in plaintiff's territory; and it was held piracy or infringement of plaintiff's copyright, although they were genuine or lawfully printed copies. It was not a stipulation of the contract for the printing, that the copies should be sold in a particular territory, which was enforced, but a violation of the plaintiff's copyright, that was redressed. This case is very nearly a direct precedent for the judgment here.

But there can be no happier illustration of the distinction I am endeavoring to take than that afforded by the difference between the case we have in hand and that of *Clemens* v. *Estes*, 22 Fed. Rep. 899. There, as here, the book was sold by subscription; but the agents had *purchased* the copies of the book, and had bound themselves not to sell, except by subscription. The defendants had no notice of that agreement of the agents, and the court refused to enjoin them. I do not know that I need to express the opinion here, but it seems to me that the court might have gone further, and, on the authority of the cases above cited, held that a sale by the agents in violation of their agreement, even with notice to the defendants, would have been no infringement of the copyright, on the distinction I have endeavored to point out. The agents being *owners* of the copies of the book, had a right to sell them, so far as the copyright goes; and their contract not to sell them was not within the domain of the copyright statute, whatever other remedy in equity or at law there may have been in any court of competent jurisdiction, state or federal, to enforce it. A breach of the contract, or even a conspiracy with the agents to procure a breach, would not be a case arising under the copyright laws of which the federal courts would have exclusive jurisdiction. Rev. St. § 711, subsec. 5. Every breach of contract about a patented article or a copyrighted book does not perforce of that fact belong to the federal jurisdiction to redress as one arising under those laws, and we must not lose sight of that important consideration in such cases as these. Judge BLODGETT intimates this distinction in *Baldwin* v. *Baird*, 25 Fed. Rep. 293, and it is a familiar one to both our patent and copyright law. Here, the plaintiff did not sell its books to agents with a contract that they would sell only by subscription, but, on the contrary, sold them directly to subscribers, through agents, who had no other function to perform than to solicit subscriptions and deliver the books. The copies in controversy were sent to the agent for delivery, and were never his property, but that of the plaintiff, who was the owner both of the books and of the copyright. It is a most important difference, and one that will reconcile this judgment with all the cases mentioned.

Courts of equity will, whether the property be patented inventions, copyrighted books, or what not, interfere by injunction, in proper cases, to prevent the destruction or injury of property liable to be affected by the peculiar conduct complained of in the given case. It was done in *Springhead, etc., Co.* v. *Riley,* 6 Eq. Cas. 551, where the cases are reviewed, to prevent strikers from obstructing the plaintiff in securing labor, thereby producing otherwise irreparable mischief. In patent and copyright cases there is a further or cumulative remedy in the courts especially empowered to protect them, as this court is in this case; but it must be, to receive the especial protection, strictly a case involving the patent or copyright itself, or some incident to it, and not simply an ordinary contract concerning the products of the one or the other. The owner of the copyright may not be able to transfer the entire property in one of his copies, and retain for himself an incidental power to authorize a sale of that copy, or, rather, the power of prohibition on the owner that he shall not sell it, holding that much, as a modicum of his former estate, to be protected by the copyright statute; and yet he may be entirely able, so long as he retains the ownership of a particular copy for himself, to find abundant protection under the copyright statute for his then incidental power of controlling its sale. This *copyright* incident of control over the sale, if I may call it so, as contradistinguished from the power of sale incident to ownership in all property,—copyrighted articles like any other,—is a thing that belongs alone to the owner of the copyright itself, and as to him only so long as and to the extent that he owns the particular copies involved. Whenever he parts with that ownership, the ordinary incident of alienation attaches to the particular copy parted with, in favor of the transferee, and he cannot be deprived of it. This latter incident supersedes the other,—swallows it up, so to speak,—and the two cannot co-exist in any owner of the copy except he be the owner at the same time of the copyright; and, in the nature of the thing, they cannot be separated so that one may remain in the owner of the copyright as a limitation upon or denial of the other in the owner of the copy. A genuine copy, owned by the owner of the copyright, carries with it the ordinary incidents of alienation belonging alike to all property, and, if he parts with the copyright, he retains with the ownership of the particular copy this power of sale; or if he sells a copy to another, having, as owner of the copyright, authorized a transfer, the purchaser takes the copy with the ordinary incident of alienation belonging to all property; and *that* copy is no longer under the copyright law. This is the meaning of the cases cited, as I understand them; and, so understood, they do not in the least militate against this judgment.

It is a distinction, illustrated by the cases, between the incident of that monopoly of sale belonging alone to the owner of the copyright, and the incident of that exclusive and inseparable right of alienation belonging always to the owner of a copy of the work lawfully printed,

which appears more plainly under our statute than the English statute, but alike under both, and there should be no confusion of the two, as there is apt to be, if the cases are not very critically observed. In this case the defendant is in no sense the owner of the copies in controversy, having obtained them surreptitiously from the owner of the copyright, or, what is the same thing, from one who so procured them. And here, again, I would especially invite attention to the distinction between the ownership of the mere materials in the books and that of the books as literary products; for he might possibly be the owner of the material elements, and yet not the owner of the literary constituents of the books.

In *Keene* v. *Kimball,* 16 Gray, 545–551, it seems to have been intimated that the injunction would have been granted if the copy of the play had been surreptitiously obtained. In *Bartlette* v. *Crittenden,* 4 McLean, 300, S. C. 5 McLean, 32, it is said, in a case where students had published cards copied for instruction from the teacher's system of book-keeping, resting in manuscript: "At common law, independent of statute, I have no doubt the author of a manuscript might obtain redress against one who had surreptitiously got possession of it;" and in *Nicols* v. *Pitman,* 26 Ch. Div. 374, a stenographer was enjoined from printing a report of a lecture spoken from manuscript to a limited audience. It was put on the ground of a breach of contract, as in the leading case of *Abernethy* v. *Hutchinson,* 1 Hall & T. 28, where it was said that, no matter how possession was obtained, hearers cannot, either of themselves or by transfer to another, publish for profit that which they had not obtained from the author the right to sell. These cases, and those like them, support this judgment in principle; for if this be true of the common-law right of property in manuscript before publication, it is equally so as to the statutory property in copyright, unless the statute restricts it in some way. It is an incident inherent in literary property, and necessary to its security, whether it be the gift of the common law or the statute.

Although it is not at all a copyright case, in this same view of it, the great case of *Prince Albert* v. *Strange,* 1 Macn. & G. 25, S. C. 2 De Gex & S. 652, is a potential support for this judgment. I had prepared a careful analysis of that case to show this, but shall not protract my already too long opinion to include it. The defendant was enjoined from exhibiting or selling, for his profit, genuine copies of the etchings surreptitiously procured from the owner's printers; and although, in other respects, the case has been much criticised, as to that part of the injunction there was never any doubt or criticism. The same principle applies here. The defendant had no notice in that case, but it was immaterial, as the lord chancellor said, as it is in other kinds of piratical depredations on literary property. He placed his judgment on the broad and satisfactory ground that "one is entitled to be protected in the exclusive use of that which is exclusively his." And I say this is so, whether it be the exclusive

right of use, or the exclusive right of sale, and whether either be a statutory grant, as here, or, like that case, a common-law grant; and the rule of decision is the same, whether we proceed under the ordinary remedies, at law or in equity, for damages or breach of trust, or whether we exercise the statutory power of protection given by section 4970 of the Revised Statutes. That case also calls attention to the necessity that one who proposes to become a dealer shall make inquiry when he fairly should do so. 2 De Gex & S. 687; Drone, 102, 109, 403, 470, 478, 538. Vice-chancellor Bruce well remarked that the fraudulent agent could convey no better right than he himself had, and it is very applicable to the facts of this case. 2 De Gex & S. 702. Again, some of these cases, like this, were very small in the mere amount of money involved, but it was adjudicated that "whether profits have been large or small, the question of right of publication is the same." *Nicols* v. *Pitman, supra; Prince Albert* v. *Strange, supra.*

I do not wish to close this opinion without saying that I do not exalt literary property above other kinds, nor hedge it about with a divinity of right and remedy not belonging to all other property; but simply place it in the category of all the rest, only finding that, because of its delicate and peculiar characteristics, congress has been invested with peculiar powers of protection for it, which it surely needs to place it on a fair footing with other property. It is especially liable to piratical depredation, like that attempted in this case, whereby the owner loses his fair profits; and I only hold that congress has provided, as a convoy for it, a fleet of rights and remedies particularly adapted for defense against pirates, whether they sail under the black flag of the marauding printer, or the ordinary flags of commerce, falsely displayed for purposes of spoliation. But, after all, other property receives just as full protection, and, when it need be, by other special methods, where the power to devise them exists.

#### DECREE.

It only remains to say that the plaintiff is entitled to a decree, but there need be no expense for an account. The defendant received six copies, and has sold five, at a profit, he testifies, of $5.86. This, and the interest on it, he must pay to plaintiff within 60 days, or execution may issue for it. Possibly, he should be made to pay the full publisher's price, but I assume that there should be no controversy over so small a difference, for the money's sake; and, so far as the precedent is concerned, I prefer not to go beyond the profits now, and reserve the point. As to the remaining volume, defendant should be perpetually enjoined from selling it, certainly. I am inclined to think he should also be enjoined from lending it, or even from reading it, and possibly, from every conceivable use of it as a literary production. It is a small matter, perhaps, but, as

the cases show, it is not the extent of the injury, but the character of it, that is involved; and until the plaintiff is paid, and voluntarily consents to part with its property in that copy, the defendant should not injure the plaintiff by lending the book to one who might otherwise buy it, or to a larger number who might otherwise buy, or even by reading it himself, unless he buys the privilege from the plaintiff, its owner. I do not generally hesitate to go in judgment with the logic of my position, but since I doubt whether the court can, under section 4964 of the Revised Statutes, declare a forfeiture of this copy, I hesitate to impose an injunction which amounts to that, although it may be that it is a clear equitable remedy, under section 4970 of the Revised Statutes. Hence I shall, in this case, only enjoin the sale, and reserve the other points, with leave to the plaintiff to apply for an extension of the injunction if the defendant shall refuse to amicably surrender the copy, which he has no sort of right to retain for any use as a literary production, whatever his right may be in other respects. Suppose it were a copyrighted play, the defendant would be enjoined from its exhibition, whether to an audience of one or thousands; and there are cases, of which I took no note, that hold that even a gratuitous exhibition, in places somewhat domestic, might be enjoined as an injury which resulted in keeping people from a desire to see the authorized performance. So, here, this unauthorized genuine copy might be used, as a more certainly piratical one could be, to limit the lawful buyers. Second-hand copies, regularly sold, would do the same, it is true, but that use of them is incidental to property in them, and has been paid for. But perhaps the plaintiff should submit to this injury by one copy as a somewhat inevitable accident of the situation, incident to such property; and in this case, for the present, we will treat it as *de minimis*. Drone, Copyr. 527. But the plaintiff has no foundation for the claim for an injunction restraining defendant from dealing in this book in the future otherwise than as he may deal with the plaintiff, or of interfering with its local agent in his work. It will be time enough to apply whatever remedy it may have when he procures other surreptitious copies, and we cannot adjudicate in advance that he may not have a perfect right to sell any other copies than those involved in this controversy. The defendant will pay the costs. Decree accordingly.