In re REISWIG.

VALLELY v. GALBRAITH.

(District Court, D. North Dakota.   October 10, 1918.)

1. BANKRUPTCY ⟐⟐272—ADMINISTRATION OF ESTATES—DUAL ADMINISTRATION
      THROUGH GENERAL ASSIGNMENT AND BANKRUPTCY.
      The practice of the Northwestern Jobbers' Credit Bureau, one of a
      number of corporations organized by jobbers, and whose stockholders
      usually own a majority in number and amount of claims against insol-
      vent mercantile debtors in a number of districts, in handling the estates
      of such debtors, held to require careful scrutiny. Such practice has been
      frequently to pass the estate first through a common-law assignment, and
      then through an administration in bankruptcy, resulting in dual expenses
      of administration, to the detriment of creditors outside of the Bureau.

2. BANKRUPTCY ⟐⟐288(3)—JURISDICTION OF COURT—SUMMARY PROCEEDINGS.
      Where bankruptcy succeeds a common-law assignment within four
      months, based on the assignment as an act of bankruptcy, the bankruptcy
      court has jurisdiction by summary proceedings to call upon the assignee
      to account for funds withheld for fees and expenses.

3. BANKRUPTCY ⟐⟐288(3)—SUMMARY JURISDICTION—ADVERSE CLAIMANT.
      A common-law assignee holds the property as agent for the assignor, and
      where bankruptcy follows within four months the fact that he claims a
      certain part of the funds still in his hands for fees and expenses does
      not convert him into an adverse claimant.

4. BANKRUPTCY ⟐⟐474—PROCEEDINGS BEFORE REFEREE—ALLOWANCE OF COSTS.
      A person brought before a referee in bankruptcy by an order to show
      cause, on a successful defense, is not entitled to have his bill for ex-
      penses and attorney's fees taxed and paid from the estate.

In Bankruptcy.   In the matter of Conrad C. Reiswig, bankrupt.
On petitions of John Vallely, trustee, for review of order of referee,
and of John P. Galbraith for review of second order.   Reversed
as to first order, and affirmed as to second.

Fisk & Murphy, of Minot, N. D., for petitioner.
Todd, Fosnes, Sterling & Nelson, of St. Paul, Minn., for respond-
ent.

AMIDON, District Judge.   Respondent, John P. Galbraith, was
assignee under a common-law deed of assignment of the bankrupt's
estate, dated August 18, 1917.   He immediately took possession and
sold the stock and fixtures for $12,340.09.   From collections and
other minor items, he brought the total of the estate up to $13,289.78.
Within four months after the assignment, to wit, December 3, 1917,
an involuntary petition in bankruptcy was filed, and on December
22d adjudication was made.   The petitioner, John Vallely, was elect-
ed trustee, and qualified on January 21, 1918.   On February 4, 1918,
respondent, Galbraith, filed with the referee in bankruptcy his re-
port and account as assignee, which showed receipts as above, and
set forth a detailed statement of disbursements, amounting to $1,-
631.53, leaving a balance of $11,658.25, which he turned over to
petitioner as trustee in bankruptcy.   The residue, to wit, $1,631.53,
Galbraith retained as legitimate disbursements and fees under the
common-law assignment.   The report closed with a prayer for an

⟐⟐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

order "approving and allowing said account, and approving all acts of your petitioner as such common-law trustee."

Upon this report and a brief petition by the trustee in bankruptcy, the referee, under date of April 18, 1918, made an order upon respondent to show cause why he should not pay over to the trustee $1,474.10 of the sum withheld by him as common-law assignee, embracing such items as his fees, $430.33, and expenses for taking the inventory and investigating the business condition of the bankrupt. In response to this order respondent entered a special appearance, and objected to the jurisdiction of the court on two grounds, to wit: (1) That respondent is a resident and citizen of the state of Minnesota, and not within the territorial jurisdiction of the court. This objection was not pressed, and was plainly untenable, in view of the fact that respondent by his report had submitted himself to the jurisdiction of the court. (2) That respondent is an adverse claimant to all moneys referred to in the order to show cause, and cannot be held to show cause in this summary proceeding. The referee withheld his ruling upon this objection, and thereupon, without waiving the objection, respondent produced his evidence, going fully into his administration of the estate as common-law assignee, and attempting to show that the sums charged were all reasonable and beneficial to the estate. At the conclusion of the hearing the referee dismissed the order to show cause, upon the objection to the jurisdiction of the court to proceed otherwise than by plenary suit. This ruling is certified to the court for review on petition of the trustee.

Respondent presented to the referee a cost bill for expenses and attorney's fees in connection with the order to show cause, amounting to $377.80, and asked that the same be taxed and that the trustee be ordered to pay the amount out of funds of the estate, as part of the expenses of administration. The referee denied this petition, and that ruling has also been certified to the court for review on petition of respondent.

[1] The case is of greater importance than the pecuniary interest indicates. It involves the power of courts of bankruptcy to deal by summary order with a practice that has become general of passing estates of insolvent retail merchants through both common-law assignment and bankruptcy. A brief summary of the facts disclosed by the record will be necessary to present this practice.

Respondent, Galbraith, is general manager, treasurer, and secretary of a corporation known as the Northwestern Jobbers' Credit Bureau, organized under the laws of Minnesota. Its stock is mainly held by jobbers located at Minneapolis and St. Paul. The objects of the Bureau are:

"First, the exchange of ledger information between subscribing members; second, the investigation of the estates of failing debtors and the liquidation of their affairs; third, the obtaining of evidence in order to assist in the efficient prosecution of fraudulent failures."

The Bureau is one of 65 similar organizations located in important wholesale districts throughout the United States, all of which operate under the general supervision of the National Association of

Credit Men of New York City. These bureaus co-operate with one another in liquidating estates of insolvent merchants, and in mercantile cases almost invariably represent a majority in number and amount of creditors. The Northwestern Jobbers' Bureau, although a corporation, having capital stock, does not pay dividends. Its earnings are first used to pay salaries of employés and the overhead charges. The surplus earnings are used in assisting in the prosecution of fraudulent bankruptcies. Mr. Galbraith is paid a salary of $6,300, and the numerous other employés are paid salaries ranging from $1,500 to $3,000 annually. The Bureau also has at its command a corps of experts upon whom it may call to take inventories, investigate business transactions of merchants, and dispose of stocks that come within the control of the Bureau. It also has a force of clerks, and such other assistants as experience has shown to be necessary in transacting its large business. In districts other than Minnesota it has one or more men whom it regularly elects as trustee in bankruptcy. Mr. Vallely usually acts for it in that capacity in North Dakota. The Bureau extends over the states of Minnesota and North and South Dakota, and parts of Wisconsin, Michigan, Iowa, and Montana, and handles about 300 estates per year. It collects a fee of 5 per cent. upon the amount distributed to creditors, or, in case a common-law assignment is succeeded by bankruptcy, 5 per cent. of the amount turned over to the trustee in bankruptcy. In addition to this fee it charges for the wages paid to special employés for conducting investigations, taking inventories, etc.; also for attorney's fees paid out by it, and numerous smaller sums for postage, stationery, stenographic work, etc.

In about one-third of the estates the practice has grown up of first taking a common-law assignment. Under this the estate is converted into cash, and the affairs of the merchant carefully investigated. Sometimes the estate is distributed under the assignment, but more frequently a petition in bankruptcy is later filed, and the estate finally distributed under the Bankruptcy Act. In these deeds of assignment, and in bankruptcy cases in Minnesota, Mr. Galbraith is named as assignee and trustee. He acts throughout as the agent and officer of the Bureau. All funds received by him are paid into a trust account of the Bureau. Against this Mr. Galbraith draws checks on behalf of the Bureau for the payment of dividends to creditors, or for turning over funds to a trustee in bankruptcy. Sums deducted for expenses, and the 5 per cent. fee of the Bureau are passed to an "expense account." The fee and all sums charged for by the Bureau belong to it, though they are presented in the accounts of the assignee and trustee as his fees and expenses. Out of the fund created in the so-called "expense account" the salaries of Mr. Galbraith and the other regular employés are paid. Thus it is clear that, while he acts as trustee under the deed of assignment, he in fact is acting simply as the agent of the Bureau, and all funds coming into his hands as assignee are held by him as its agent and officer.

It was stipulated upon the hearing that Mr. Galbraith and the Bureau are amply able to respond to any order made by the referee

or the court for the restoration of any part of the sum withheld under the common-law assignment.

From this statement it is plain that the power of the Bureau over the estates of insolvent retail merchants ought to .be subject to the careful scrutiny of courts. It is a permanent organization and continuous in its activities. It thus acquires a skill and power such as other creditors do not possess. It is efficient, and I do not in this opinion make any reflection upon the integrity of its policies; but such agencies representing a single class, so long as human nature is what it is, are likely to develop practices such as are almost inseparable from a permanent bureau, and also such as press their rights beyond the limits of what is just and fair. While it is true in mercantile failures that wholesalers, constituting as they do a majority in number and value of creditors, are entitled to the influence which the law gives to those having such majority, it ought never to be forgotten that the power thus exercised is in the nature of a trust, and can never properly be used to secure to the wholesale merchants, or the agents of the bureau acting in their behalf, any unjust advantage. Their position is the same as that of a majority of stockholders with respect to the minority, as explained in the memorable opinion of Judge Sanborn in the case of Jones v. Missouri-Electric Co., 144 Fed. 765, 75 C. C. A. 631. It is also true that the Bankruptcy Law (Act July 1, 1898, c. 541, 30 Stat. 544) speaks in unmistakable terms against exorbitant or duplicate expenses. This feature of the act was emphasized by section 72, which was added by the amendment of 1903 (Act Feb. 5, 1903, c. 487, § 18, 32 Stat. 800 [Comp. St. 1916, § 9656]). Courts, whenever their attention has been called to unreasonable or illegal charges, have been prompt and firm in applying the remedy. They have also declared with equal emphasis that services rendered under a common-law assignment can only be allowed in case a petition in bankruptcy is filed within four months after the assignment, when the services are shown to have been beneficial to the estate, and then only to the extent to which they have been beneficial. Randolph v. Scruggs, 190 U. S. 533, 23 Sup. Ct. 710, 47 L. Ed. 1165, and the many cases in the lower federal courts which have followed that decision. It is manifest, therefore, that the practice of passing estates of insolvent merchants through both a common-law assignment and bankruptcy has the burden of justifying itself, unless the mere statement of account shows the practice to have beneficial as to a particular estate.

My attention has within the past few months been called to certain concrete cases by the clerk of court of this district, by some of the referees, and also by clerks of courts of other districts of the Eighth Circuit in which I have been sitting, which show clearly that these bureaus have already developed practices which need correction. Fortunately in this district the whole subject has been brought under examination by an able examiner of the Department of Justice, Mr. Delmas C. Stutler. He has submitted a detailed report to the Attorney General, a copy of which has been transmitted to me. I set forth in a note a quotation from this report, believing that it

will not only show the reason why I think there is cause for careful supervision over the conduct of this particular bureau, but in the hope that this full statement of the subject will lead to a more careful supervision· of the practices of similar bureaus in the administration of insolvent mercantile estates in other districts.[1]

None of these practices have ever been brought to my attention -by appeal or certificate. This is due to the fact that the interest of no individual creditor in any particular estate was sufficient to

[1] Regarding the Northwestern Jobbers' Credit Bureau, it is deemed proper at this point to call attention to certain of their methods and practices in the control and management of estates in this district that appear to be somewhat questionable. This appears to be an organization, co-operative in its nature, composed of the jobbers in various lines of business in the northwest section of the country, who as stockholders pay into the association certain dues or assessments to defray expenses, etc., of the association in protecting their various interests, by keeping in touch with business conditions, collecting claims of creditors, furnishing legal counsel and advice, and protecting their interests in all bankruptcy and other matters generally. No doubt it is a perfectly legitimate and beneficial establishment, composed of members who are well-meaning and at all times 'aiming, as regards the conduct and management of bankruptcy matters, to strictly comply with the requirements of the Bankruptcy Act, and in addition thereto lend every assistance of their association to the strict enforcement of the law.

However that may be, the examination of various accounts of trustees in closed cases on file in the clerk's office_at Fargo invariably showed that in those estates controlled by the Northwestern Jobbers' Credit Bureau, and managed by their professional trustees the cost of administration was far in excess of costs of estates of similar magnitude administered by local trustees. In fact, cases were found which had been managed by the Bureau through its trustee (elected by its stockholder creditors), where the fees and expenses claimed and allowed appear absolutely unreasonable and exorbitant. As an instance of this, the Hilman Mercantile case is cited (Bankruptcy No. 1987), wherein the law firm of Todd, Fosnes, Sterling & Nelson, of St. Paul, representing Arthur R. Smythe, trustee, who was appointed by the association's majority control, filed a claim for professional services amounting to $2,006. A copy of said claim is attached hereto, marked Exhibit B and made a part of this report.

Referring to said exhibit, under date of December 10, 1916, is a charge of—
Mr. Fosnes at Grand Forks, N. D., to go over files with referee and
  secure order for payment of second dividend...................$ 25.00
Of April, 1917, 292 letters written............................... 146.00
Of April, 1917, 220 letters received and examined................ 110.00
General conference with trustee and other services which cannot be
  specifically enumerated, consuming at least twenty days....... 675.00

    The total of which is.....................................$956.00

Mr. Sveinbjorn Johnson, the referee in this case, disallowed the above amount for very good reasons, apparently so, at least, and notified said attorneys of this disallowance under letter dated April 21, 1917. A copy of said letter is attached hereto, marked Exhibit C, and made a part of this report. Mr. Johnson states in his letter that these claims appear to be exorbitant, etc.; but it was found that later the trustee and his attorney prevailed upon him to allow the claim, on the argument, as Mr. Johnson advised me, that the Credit Bureau represented the majority of the creditors, and were therefore in position to dictate the payment of the trustee's attorney fee.

Not only are the fees and expenses of attorneys designated by the Jobbers' Bureau apparently set out of proportion to the ordinary or average fees and expenses incurred by local attorneys, but the cost for travel on the part of trustees which they elect, and of so-called experts sent from St. Paul to

lead him to assume the expense of conducting such a review, or carrying on a contest with an organization so powerful and skillful as the Bureau. It is hardly necessary to add that, upon the court's attention being brought to the subject by the report of the examiner, the rules of court have been modified so as to correct the evils pointed out, and the attention of referees upon whom the administration of the bankruptcy law must mainly devolve has been called to the necessity of exercising an independent judgment, and not allowing

North Dakota to prepare inventories, is enormous. All of these expenses are incurred by the Jobbers' Credit Bureau as a matter of course, without previous application to the referee or court to incur such expense. If the officer of the Bureau feels that it is advisable to send a man from St. Paul to Minot, N. D., probably 500 miles, to inventory stock of goods, or if they see fit to put a detective to work to unearth concealed assets at an expense of $400 or $500, they do it, without asking the court for previous authority. They pay the expense and present the bill to their trustee for payment as a matter of course. They may not have done this with all the referees, but the record indicates that the practice has been permitted under Referees Smith, Elton, Johnson, and O'Hare.

Mr. Elton, referee, who is now closing up his referee business, stated that he was of the opinion that the Northwestern Jobbers' Credit Bureau was a detrimental figure in the economical administration of bankruptcy estates in North Dakota: that fees have been actually claimed by the association's attorney for representing general creditors (not petitioning creditors), on the theory that the association, representing the majority of creditors, had, by experienced men and prompt administration, saved money for all creditors; that not only are expenses of their official trustee, for travel back and forth, enormous, but other expenses are incurred in proportion; that attorney's fees and expenses of travel to attend meetings to declare dividends have been paid when such attendance on the part of attorney is considered unnecessary.

Referee Lewis, at Minot, who is believed to be an excellent, high-grade, and up-to-date referee, appears to have had some of this business to contend with himself, as is evidenced by a rule which he promulgated for his court regarding attorney's fees, etc., and his letter of January 17, 1917, addressed to Bosard & Twiford, attorneys, regarding expenses incurred generally by the Northwestern Jobbers' Credit Bureau. Copy of this rule and letter are attached hereto, marked Exhibits D and E, respectively, and made a part of this report.

As a further illustration of possible unnecessary expenses incurred and paid in estates administered through the supervision of the Northwestern Jobbers' Credit Bureau, attached hereto, marked Exhibits F and G, are statements of account filed and allowed in the Kath Bros. case, for fees and expenses of Morphy, Bradford & Cummins, and statement of John Vallely, trustee in the same case, for expense of travel back and forth from Grand Forks, his residence, to Fargo, the official residence of the referee, and other places. This latter bill will give some idea of expenses usually incurred by the association's trustee, who is appointed possibly without regard to the distance from his residence to the headquarters of the referee or the location of the assets to be administered. In this case (Kath Bros.) the Northwestern Jobbers' Credit Bureau procured the service of Oswald Jones Detective Agency to investigate a shortage of stock of merchandise, paid for said service the sum of $493.47, and filed claim for same against the estate. Previous authority was not asked of the court to incur the expense, and the claim was filed and allowed as a matter of course.

It seems apparent that the minority creditors in estates handled by the association have been imposed upon, and it is very apparent that some of the referees have also been imposed upon somewhat, in permitting this association to take matters into their own hands and conduct the administration of estates according to their own ideas, regardless of the requirements of the law.

trustees who represent a majority of creditors, or their attorneys, to waste estates by unnecessary or illegal expenses, or to overawe referees in the firm performance of their duties.

[2] Turning, now, to the first certificate of the referee, the question is: Has a court of bankruptcy, in such cases as I have described, power to call upon a common-law assignee to account by summary process for funds deducted from the estate as fees and expenses, when a petition in bankruptcy is filed within four months, and is based upon the assignment as an act of bankruptcy?

It is the uniform holding of the federal courts that as to the capital of the estate the common-law assignee is not an adverse holder, but a mere agent of the assignor for the distribution of the estate among creditors. Bryan v. Bernheimer, 181 U. S. 188, 192, 21 Sup. Ct. 557, 45 L. Ed. 814; Davis v. Bohle, 92 Fed. 325, 326, 327, 34 C. C. A. 372; In re Bininger, Fed. Cas. No. 1,420, 3 Fed. Cas. 412, 417; In re Stuyvesant Bank, Fed. Cas. No. 13,581, 23 Fed. Cas. 207, 209; Randolph v. Scruggs, 190 U. S. 533, 23 Sup. Ct. 710, 47 L. Ed. 1165. In the present case the assignee was not acting under the supervision of a state court, charged with the jurisdiction of examining his accounts and fixing his compensation. All these matters lay simply in the personal judgment of Mr. Galbraith and the Jobbers' Bureau, for which he was acting. May he, by his mere say-so, deduct from the estate such sums as seem to him just, and turn over the residue to the court of bankruptcy, and say that as to the sums deducted he is an adverse claimant, and can be called to account only by a plenary suit? The referee held that he may. The decision was made reluctantly, and upon the expressed opinion that such a practice is not consistent with sound administration of estates of bankrupts. But the referee felt that he was compelled to reach that conclusion by the decision of the Supreme Court in the case of Louisville Trust Co. v. Comingor, 184 U. S. 18, 22 Sup. Ct. 293, 46 L. Ed. 413. In my judgment that decision does not require such a holding. To understand the decision of the Supreme Court it is necessary to examine with some care the case, as more fully reported in Sinsheimer v. Simonson, 107 Fed. 898, 47 C. C. A. 51.

The controlling features of the Comingor Case are these: The bankrupts made a general assignment for the benefit of creditors in December, 1898. Comingor was the assignee. The administration upon the assignment was under the jurisdiction and control of the state court. By the local practice a suit had to be instituted immediately upon the execution of the assignment, by means of which parties concerned were brought before the court, and from that time forward the assignee acted under the court's supervision. The petition in bankruptcy was filed on February 14, 1899, two months after the assignment, but the case was pending in the District Court, and the Court of Appeals, until February 12, 1900, before the adjudication was actually made. In the meantime the estate had been converted into cash, amounting to $92,865.77. The assignee had paid out to attorneys representing him $3,200, and had credited himself and paid out as fees belonging to himself $3,300; that amount being such a sum as would have been due him under the established practice

of the state court. The trustee in bankruptcy had applied to the state court upon a petition stating, among other things, "that the officers of the court had been paid in full, and had no claims on the fund in court," and upon that statement had obtained an order for the turning over of $46,305.03, remaining in the estate after crediting disbursements as to which there was no objection, and also the fees of the assignee, $3,300, and his counsel, $3,200. Having thus obtained the capital of the estate without any formal action of the state court, settling the account of the assignee, the referee of his own motion cited Comingor to show cause why he should not pay to the trustee in bankruptcy the $3,300 deducted as his own fees, and $3,200 previously paid out by him to his counsel. In response to this order Comingor set forth that before the petition in bankruptcy was filed he had made the payments to his counsel, and had credited to himself and paid out the fees, believing them to be due according to the state practice; that he had none of the funds in his possession, and no means wherewith to pay them, and furthermore he stated, in one of his returns, that he had tried to borrow or raise the money with which to make the payment and found it impossible to do so. See 107 Fed. 901, 47 C. C. A. 51. The referee and trial court, in making the order absolute, did not question the amount of Comingor's fees under the state practice, and conceded that the amounts which he had paid to his attorneys were "usual and reasonable, according to the scale of compensation allowed for such services by the state court." Their theory, however, was that, as the assignment was an act of bankruptcy, it was void, and afforded no protection for any disbursements for fees or services made under it, and they ruled upon this legal theory that the money was "in contemplation of law" in Comingor's possession. Their legal theory as to the assignment was clearly wrong. While it was rendered void upon the filing of the petition in bankruptcy, it was not fraudulent, and acts done under it in good faith, and in the exercise of a reasonable discretion, would be fully protected if they were beneficial to the estate, and would in any case afford a shield against an order that the officer be committed to jail as for contempt for failure to return the money. Randolph v. Scruggs, 190 U. S. 533, 23 Sup. Ct. 710, 47 L. Ed. 1165; Summers v. Abbott, 122 Fed. 36, 58 C. C. A. 352; Bramble v. Brett, 230 Fed. 385, 388, 144 C. C. A. 527.

This brings us to the gist of the Comingor Case. Conceding the return of Comingor to be true, had the referee and District Court power to make the rule absolute and commit Comingor to jail for failure to return the money? The Circuit Court of Appeals and the Supreme Court held that no such power existed, but that Comingor, if he was liable at all, was only liable for debt, and could only be proceeded against by a plenary suit and a common-law judgment. The Circuit Court of Appeals bases its decision upon the ground that the return was a complete defense upon the facts, and reversed the case upon that ground, and directed that the order making the rule absolute should be set aside. The Supreme Court bases its decision

upon slightly different grounds. It holds that the assignee had acted in good faith, that he had not the funds in his possession, and that upon this showing the referee and District Judge were without power or jurisdiction to deal with the subject by means of the summary process, for under that the only execution that could be issued against Comingor would be a jail sentence, and the court holds that if Comingor was legally liable to make good the fund, because of the invalidity of the assignment, he could not be compelled to do so by a jail sentence, but could only be proceeded against by an appropriate action which would result in a common-law judgment for the fund, upon which collection could be made against Comingor's property, if he had any, or upon his bond if he had given a bond. In other words, the reason that underlies the decision is that, upon the showing made by Comingor, the jurisdiction of the referee and the District Judge to proceed to the absolute order ceased, and the only right of a trustee in bankruptcy against him for the recovery of the money must be by a proceeding for the collection of a debt.

[3] Such being the real decision in the Comingor Case, it is not an authority for the doctrine that a court of bankruptcy has no jurisdiction to cite a common-law assignee to account for moneys which have come into his hands under the assignment, but is only an authority against the abuse of the jurisdiction. The assignee, as to all moneys which come into his hands under the assignment, is the agent of the bankrupt, and the fact that he claims a certain part of the fund for fees and expenses, does not make him any more an adverse claimant as to those sums than the same claim would be for the residue of the estate. The assignee cannot by his mere say-so cause himself to cease to hold a part of the estate as the agent of the bankrupt, and convert himself into an adverse claimant. If, while acting in good faith as assignee, he had actually disbursed the moneys which he claims as fees and expenses, he cannot be committed to jail for failure to turn them over. When the summary proceeding has reached that stage, it cannot proceed to a jail sentence; but the trustee in bankruptcy, if there is a legal liability, as for debt, against the assignee, must proceed by plenary suit, so as to recover a money judgment which may be enforced against property by execution.

In the attempt to distinguish the Comingor Case there has been much refinement as to whether the payments were made by the common-law assignee before the petition in bankruptcy was filed, or after the petition, or, again, whether it was made before adjudication or after adjudication. These distinctions do not rest upon differences which go to the jurisdiction. The assignee at all times holds all funds that come into his hands as the agent of the bankrupt. He may be called upon by summary process to account for those funds. If he shows that he has acted in good faith, and parted with the funds, he cannot be committed to jail for failure to turn them over. If he is legally liable, either because his acts have not in the judgment of the bankruptcy court been beneficial to the creditors of the estate, or for any other reason, he is simply liable for a debt, and the trustee must resort to a plenary suit, in which the liability may be enforced by execution.

Any one dealing with the property of a bankrupt after a petition has been filed, or after such an act of bankruptcy as on its face is notice that the bankruptcy law is applicable to the situation, such as an assignment, or the appointment of a receiver on the ground of insolvency, must deal with it subject to the relating back of the trustee's title, and the supervision of the bankruptcy court over all acts since the date to which such title relates back. In such a case the jurisdiction of the court of bankruptcy exists, but what will be done in the exercise of that jurisdiction must depend upon the facts of each case. It must be borne in mind that here, as between state courts, and the court of bankruptcy, the jurisdiction is successive and not concurrent. In re Watts & Sachs, 190 U. S. 1, 27, 35, 23 Sup. Ct. 718, 47 L. Ed. 933; Randolph v. Scruggs, 190 U. S. 533, 537, 538, 23 Sup. Ct. 710, 47 L. Ed. 1165; In re Zier & Co., 142 Fed. 102, 73 C. C. A. 326; same case as Watts & Sachs, 190 U. S. 1, 23 Sup. Ct. 718, 47 L. Ed. 933, upon its return to the lower courts after the decision in 190 U. S. 1, 23 Sup. Ct. 718, 47 L. Ed. 933. "The bankruptcy jurisdiction, when properly invoked, supersedes the prior proceedings in the state court for winding up the corporation 'as to which the jurisdiction is not concurrent.'" 142 Fed. 103, 73 C. C. A. 327. While this important consideration modifies the doctrine of comity, it does not destroy it. In re Watts & Sachs, 190 U. S. 1, 23 Sup. Ct. 718, 47 L. Ed. 933; Shannon v. Shepard Mfg. Co., 119 N. E. 768, 42 Am. Bankr. Rep. 12 (Sup. Court of Mass.); In re Neuburger (D. C.) 233 Fed. 701; s. c., 240 Fed. 947, 153 C. C. A. 633. The cardinal rule must always be: Has the dealing with the estate been beneficial to creditors? If not, then, in the light of the situation as it existed at the time the dealings occurred, would an intelligent business man have believed that the dealings would so result?

The assignee here, when cited to show cause, had not parted with the funds in any real sense. The transfer to a different account on the books of the Northwestern Credit Bureau was a mere matter of bookkeeping. It is conceded that he and the Bureau are amply able to respond to any order made in the summary proceeding for the return of any part of the fund involved in the order to show cause. The deductions were made as a part of the accounting at the time the balance of the estate was turned over by Galbraith as assignee. Such being the case, the referee was vested with jurisdiction to deal with the subject under the order to show cause, and to determine whether, under the facts and the law, an order ought to be made requiring respondent to turn over any part of the $1,474.10 withheld from the estate. The order of the referee, therefore, dismissing the order to show cause for want of jurisdiction, is reversed, and the cause is remanded for such further action as the facts justify.

[4] The question certified in the second certificate is plain. Neither the bankruptcy law nor the cost bill in equity prescribed by the federal statute authorized the referee to tax respondent's cost bill, or to order the same paid out of the estate. The order to show cause was nothing more than a motion. The prevailing party in such a proceeding is not

entitled to costs, unless the other party is "in mercy," so that the court can require the payment of costs as a condition of granting its further aid.

The order of the referee on this certificate is therefore affirmed.